**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| Steve Robinson and Rosanne Robinson, individually and on behalf of all others similarly situated,<br><br>        Plaintiffs,<br><br>v.<br><br>Heritage Valley Health System, Inc.,<br><br>        Defendant. | Civil Action No.: 2:23-cv-1847 |

## NOTICE OF REMOVAL

Defendant Heritage Valley Health System, Inc. ("Heritage Valley"), by and through undersigned counsel, hereby give notice that this action, *Robinson v. Heritage Valley Health System, Inc.*, Case No. 11286-2023 (Ct. Comm. Pl. Beaver Cty.), is hereby removed to this Court from the Court of Common Pleas of Beaver County, Pennsylvania, pursuant to the Class Action Fairness Act, codified at 28 U.S.C. § 1332(d), and the federal officer removal statute, codified at 28 U.S.C. § 1442.  In support, Heritage Valley provides the following "short and plain statement of the grounds for removal." 28 U.S.C. § 1446(a); *see also Dart Cherokee Basin Operating Co., LLC v. Owens*, 574 U.S. 81, 87 (2014) (same).

### NATURE OF THE CASE

1.       This case is one of numerous copycat actions being filed against healthcare providers throughout the nation.[1] As in this complaint and the others filed against

---

[1] *See, e.g., Murphy v. Thomas Jefferson Univ. Hosps., Inc.,* No 2:22-cv-04674 (E.D. Pa. Nov. 11, 2022); *Doe v. Capital Health Systems,* No. 3:23-cv-01247 (D.N.J. Mar. 3, 2023); *Doe v. Reprod. Med. Assocs. Of Phila, P.C.,* No. 2:23-cv-02540 (E.D. Pa. June 30, 2023); *Doe v. Redeemer Health,* No. 2:23-cv-02405 (E.D. Pa. June 22, 2023).

Heritage Valley, Plaintiffs allege generally that the defendant healthcare providers engaged in unlawful wiretapping and invaded their privacy by installing third-party source code for website analytics on their public websites.

2.     On September 20, 2023, Plaintiffs Steve and Rosanne Robinson filed this action in the Court of Common Pleas of Beaver County, Pennsylvania.

3.     Plaintiffs allege that Heritage Valley provides "comprehensive health care services for residents of Alleghany, Beaver, Butler and Lawrence counties, in Pennsylvania, eastern Ohio, and the panhandle of West Virginia." Compl. ¶ 33. Plaintiffs further allege that Heritage Valley "operates the website and subpages of https://www.heritage valley.org/." *Id*. ¶ 35.

4.     According to Plaintiffs' Complaint, Heritage Valley "procured and embedded the Meta Pixel on its website" onto its publicly available website. *Id*. ¶ 37. The Meta Pixel is a "sophisticated snippet of computer code" that "gathers valuable information about website visitors and the website activities." *Id*. ¶ 19. The Pixel "provides information about users' activities off Facebook—including information about their devices, websites they visit, purchases they make, the ads they see, and how they use their services." *Id*. ¶ 22.

5.     Plaintiff Steve Robinson claims that he "has been a patient of [Heritage Valley] since approximately 2010 and had a Facebook account from approximately 2013 to 2018." *Id*. ¶ 62. Similarly, Plaintiff Rosanne Robinson states that she "has been a patient of [Heritage Valley] since approximately 2010 and had a Facebook account since approximately 2009." *Id*. ¶ 63.

6.     Plaintiffs further allege that when they "visited www.heritagevalley.org and certain of their subpages" to pay for medical services or browse for doctors, healthcare

facilities, and various services Defendant offers, "the Meta Pixel instantaneously disclosed their PHI to Meta throughout their visits." *Id.* ¶¶ 64-68.

7.       Based on these allegations, Plaintiffs bring claims for:

a.       Violation of Pennsylvania's Wiretapping and Electronic Surveillance Control Act (WESCA), 18 Pa. Cons. Stat. Ann. § 5701 *et seq*;

b.       Invasion of privacy—intrusion upon seclusion;

c.       Breach of fiduciary duty;

d.       Breach of confidence; and

e.       Unjust enrichment.

## VENUE

8.       Removal to this District is proper because this Court embraces Beaver County, Pennsylvania.  *See* 28 U.S.C. § 118(c).

## BASES FOR REMOVAL

### I. Removal Is Proper Pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d)

9.       This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d), as amended by the Class Action Fairness Act of 2005, Pub. L. No. 109-2, 119 Stat. 14.

10.      CAFA grants federal courts original jurisdiction over a class action when: (1) "any member of a class of plaintiffs is a citizen of a State different from any defendant," *id.* § 1332(d)(2)(A); (2) "the number of members of all proposed plaintiff classes in the aggregate is" not less than one hundred (100), *id.* § 1332(d)(5)(B); and (3) "the matter in controversy exceeds the sum or value of $5,000,000.00 exclusive of interest and costs," *id.* § 1332(d)(2).

11.      "CAFA's provisions should be read broadly, with a strong preference that

interstate class actions should be heard in a federal court if properly removed by any defendant." *Dart*, 574 U.S. at 89. Indeed, one goal of CAFA was to provide for "[f]ederal court consideration of interstate cases of national importance under diversity jurisdiction." CAFA § 2.

12.     In particular, Congress was concerned that there were instances where state courts were guilty of "keeping cases of national importance out of Federal court," and were "making judgments that impose their view of the law on other States and bind the rights of the residents of those States." *Id.* at 682 (citing Pub. L. 109-2, § 2, Feb. 18, 2005, 119 Stat. 4).

13.     As an initial matter, while Heritage Valley contests that class treatment is proper, this lawsuit is a proposed "class action" as defined by CAFA because Plaintiffs are representatives of a putative class and they filed the case in state court pursuant to a state statute or rule of judicial procedure authorizing a class action. *See* 28 U.S.C. § 1332(d)(1)(B). Plaintiffs captioned their case as a "class action," seek relief "on behalf of themselves and all others similarly situated," and request certification of an identified class. Compl. ¶ 100.

14.     Venue in this Court is proper because the state court action is pending within the Western District of Pennsylvania.

**A. The Parties Are Diverse.**

15.     Under CAFA, there is "minimal diversity" so long as "any member" of the proposed class of plaintiffs is either "a citizen of a State different from [the] defendant," or is "a citizen or subject of a foreign state and any defendant is a citizen of a State." 28 U.S.C. § 1332(d)(2)(A)-(B). Courts consider the citizenship of all putative class members—both named and unnamed. *See id.* § 1332(d)(1)(D). Courts determine

citizenship of the members of the proposed class as of the date of filing of the complaint. *See id.* § 1332(d)(7).

16.     Heritage Valley is incorporated, and maintains its principal place of business, in Pennsylvania, and is a citizen of this Commonwealth. So long as any one member of the putative class is a citizen of another State, diversity exists for purposes of removal under CAFA.

17.     Plaintiffs' proposed class is "[a]ll citizens of the Commonwealth of Pennsylvania whose personal information was collected in Pennsylvania through the use of the Meta Pixel embedded on www.heritagevalley.org." Compl. ¶ 100.

18.     Plaintiffs' proposed class is expansive and includes both current Pennsylvania citizens and persons who were Pennsylvania citizens at the time that they visited Heritage Valley's website, but have since established citizenship elsewhere. *See id.* Plaintiffs' proposed class definition lacks any temporal scope. Class definitions generally need to identify "a particular group . . . *harmed during a particular time frame*, in a particular location, in a particular way, and uses objective criteria." *Pollock v. Energy Corp. of Am.*, No. CIV.A. 10-1553, 2013 WL 5338009, at *5 (W.D. Pa. Sept. 16, 2013), *report and recommendation adopted*, No. CIV.A. 10-1553, 2013 WL 5491736 (W.D. Pa. Sept. 30, 2013).

19.     Here, a person who was a Pennsylvania citizen when they visited Heritage Valley's website is a member of the class under the plain language of Plaintiffs' definition—even if that person has since relocated and is now a citizen of another state for purposes of CAFA diversity. *See, e.g., Brown v. Wellpet LLC,* No. 3:21-cv-00576-HAB-SLC, 2023 WL 3483935, at *21 (N.D. Ind. Mar. 31, 2023) ("As written, it is unclear whether the proposed Class includes residents who have moved from the Class area.");

*see also Smith v. Marcus & Millichap, Inc.*, 991 F.3d 1145, 1157 (11th Cir. 2021) ("But the definition does not limit the class to current Florida residents [or citizens] . . . Thus, the class definition on its face encompasses class members who currently reside in Florida facilities [and are citizens of Florida] and those who resided in facilities [and were citizens of Florida] during the relevant four-year period, but have since moved to another state . . . [C]itizenship for purposes of CAFA jurisdiction is based on current residency and an intent to remain.").[2]

20.    Plaintiffs allege that Heritage Valley began embedding the Meta Pixel in "approximately 2018," or 5 years ago. Compl. ¶ 1. Coupled with the fact that Heritage Valley provides comprehensive healthcare services in "eastern Ohio, and the panhandle of West Virginia," the citizens of those states who visited Heritage Valley's website throughout the years are included in the class and minimal diversity is satisfied. *Id.* ¶ 34.

21.    Moreover, while Plaintiffs have the right to tailor their class definition, they may not do so in a manner that attempts to circumvent proper federal jurisdiction under CAFA. This principal was recognized in *Brook v. UnitedHealth Grp. Inc.*, No. 06 CV 12954 (GBD), 2007 WL 2827808, at *4 (S.D.N.Y. Sept. 27, 2007):

> CAFA's . . . legislative history also notes that one of the common abuses in class action practice is where the original class lawyers file "'copy cat' class actions (*i.e.*, duplicative class actions asserting similar claims on behalf of

---

[2] *See also, e.g., Arbuckle Mt. Ranch of Tex., Inc. v. Chesapeake Energy Corp.*, 810 F.3d 335, 343 (5th Cir. 2016) (exercising CAFA jurisdiction because the class definition did not clearly limit class membership of gas and mineral "owners" to current, Texas citizens); *Anderson v. Davis Wright Tremain LLP*, Case No. 3:20-cv-01194-AC, 2021 WL 7184127, at *11–13 (D. Ore. July 14, 2021) (denying motion to remand and declining to read a temporal limitation into class definition which stated "Class Members are . . . Oregon citizen[s]" and noting that the plaintiff's definition lacked a temporal term like "currently"); *In re Hannaford Bros Co. Customer Data Sec. Breach Litig.*, 564 F.3d 75, 77 (1st Cir. 2009) (defining class to explicitly exclude "any persons and entities who [wer]e not citizens of the State of Florida").

essentially the same people)" in different courts. S.Rep. No. 109-14 at 42, U.S. Code Cong. & Admin. News 3, 40 12, 19. "Multiple class action cases purporting to assert the same claims on behalf of the same people often proceed simultaneously in different state courts, causing judicial inefficiencies and promoting collusive activity." S.Rep. No. 109-14 at 42, U.S. Code Cong. & Admin. News 3 U.S. Code Cong. & Admin. News 3, 40, 44. ***Plaintiffs cannot simply evade federal jurisdiction by defining the putative class on a state-by-state basis, and then proceed to file virtually identical class action complaints in various state courts. Such conduct is precisely what the CAFA legislation was intended to eradicate***. (Emphasis added).

22.     The rejection of the exact litigation strategy on display here has been noted in a well-respected class action treatise:

> The plaintiff generally can avoid CAFA jurisdiction by geographically circumscribing the definition of the proposed class to citizens of a single state. ***The district court may look beyond the class definition, however, where the plaintiff seeks to pursue a lawsuit in state court consisting of claims that already are included in a CAFA suit already pending in federal court.***

2 McLaughlin on Class Actions § 12:6 (20th ed.) (Oct. 2023 Update) (emphasis added).

23.     Because that is the precise scenario here, it is proper for the Court to look beyond the class definition in the Complaint for minimal diversity. It need not look beyond the other copycat cases filed against Heritage Valley in this district.

24.     On July 3, 2023, Plaintiff Erika Redd filed a class action complaint arising from Heritage Valley's use of the Meta Pixel on behalf of a nationwide class of "[a]ll individuals residing in the United States" who visited Defendant's website. *See Redd v. Heritage Valley Health System, Inc.,* No. 2:23-cv-01212-CB, ¶ 187 (W.D. Pa. July 2, 2023).

25.     On July 21, 2023, Plaintiff Tiffanie Bowen filed a class action complaint arising from Heritage Valley's use of the Meta Pixel on behalf of a nationwide class of

"[a]ll natural persons in the United States" and a Pennsylvania subclass of "[a]ll natural persons in the Commonwealth of Pennsylvania" who visited Defendant's website. *See Bowen v. Heritage Valley Health System,* No. 2:23-cv-01320-CB, ¶ 99 (W.D. Pa. July 21, 2023).

26.    On September 11, 2023, Plaintiff Jennifer Bartholomew filed a class action complaint arising from Heritage Valley's use of the Meta Pixel on behalf of a nationwide class of "[a]ll natural persons in the United States" and a Pennsylvania subclass of "[a]ll natural persons in the Commonwealth of Pennsylvania" who visited Defendant's website. *See Bartholomew v. Heritage Valley Health System, Inc.,* No. 223-cv-01633-CRE, ¶ 98 (W.D. Pa. Sep. 11, 2023).

27.    All of these putative class definitions necessarily included Plaintiffs' proposed class of "[a]ll citizens of the Commonwealth of Pennsylvania," and thus the Court had already asserted jurisdiction over those individuals—three separate times—when Plaintiffs filed this suit on October 3, 2023.

28.    Multiple courts around the country have expressly rejected other attempts by plaintiffs to evade removal under CAFA jurisdiction by limiting their putative class to citizens of one state, particularly where (as here) federal jurisdiction has already attached to the same putative class. *See, e.g., Simon v. Marriot International, Inc.*, Case Nos.: PWG-19-2879; PWG-19-1792, 2019 WL 4573415, at *1 (D. Md. Sept. 20, 2019) ("Because the [plaintiffs'] claims are wholly included in [pending federal actions], [plaintiffs] are attempting to represent class members already before the court in those actions. This defeats the purpose of CAFA by forcing litigation of the same claims, in both state and federal court."); *In re Kitec*, 2010 WL 11618052, *6 (N.D. Tex. 2010) (same); *Sanders v. Kia Am. Inc.*, No. 823CV00486JVSKESX, 2023 WL 3974966 (C.D. Cal. June 13, 2023)

(same).

29.     Plaintiffs limited their defined class to Pennsylvania citizens because they were aware at the time of filing that there were already "two other actions pending in federal court" on behalf of nationwide classes and one state court case seeking to represent "Pennsylvania residents." Compl. ¶ 110. But their limited, defined class of Pennsylvania citizens consists of members whose claims are wholly included in pending federal actions.

30.     Because Plaintiffs' Complaint attempts to skirt federal jurisdiction and CAFA's efficiency goals to divest the Court of jurisdiction over class members whose claims are properly before it in the *Redd, Bowen* and *Bartholomew* federal cases, the Court has authority to maintain its existing jurisdiction.

### B. The Purported Class Consists of More Than 100 Members.

31.     Heritage Valley does not believe that Plaintiffs have defined a proper class or that a class can be maintained, and asserts that it is an individualized inquiry as to whether any current or former patient falls within the proposed class definition or is entitled to relief. However, the class as proposed meets CAFA's threshold of at least 100 putative class members.

32.     The Complaint avers that "[t]he members of the Class are so numerous that individual joinder of all Class members is impracticable." Compl. ¶ 103.

33.     Plaintiffs further correctly state that "[i]n partnership with 3,800 employees and more than 600 physicians, [Heritage Valley] offers a broad range of medical, surgical, and diagnostic services at its three hospitals, Heritage Valley Sewickley, Heritage Valley Beaver and Heritage Valley Kennedy; in 55 physician offices; and 21 community satellite facilities." *Id.* ¶ 34.

34.    These allegations demonstrate that the Plaintiffs' proposed class meets the CAFA threshold of at least 100 members.

**C. The Complaint Places in Controversy A Sum Greater than $5 Million.**

35.    "[A] defendant's notice of removal need include only a plausible allegation that the amount in controversy exceeds the jurisdictional threshold." *Dart*, 574 U.S. at 89. Where, as here, a complaint does not specify an amount sought, "the defendant's amount-in-controversy allegation should be accepted." *Id*. at 87. For purposes of assessing the jurisdictional amount, what matters is the amount put in controversy by the Complaint, not whether the Plaintiffs' claims are meritorious.

36.    CAFA "tells the District Court to determine whether it has jurisdiction by adding up the value of the claim of each person who falls within the definition of [the] proposed class and determine whether the resulting sum exceeds $5 million." *Standard Fire Ins. Co. v. Knowles*, 568 U.S 588, 592 (2013). This calculation can be based on adding the value of the Plaintiffs' legal claims. *See, e.g., Truglio v. Planet Fitness, Inc.,* 2017 WL 3595475, at *3 (D.N.J. Aug. 21, 2017) (finding CAFA amount-in-controversy met based on statutory damages that would result in aggregate award exceeding CAFA's $5 million threshold).

37.    Plaintiffs' Complaint seeks damages under WESCA, which allows for: (1) actual damages, but not less than the liquidated damages computed at the rate of $100 per day for each day of violation, or $1,000, whichever is higher, (2) punitive damages, and (3) reasonable attorney's fees and other litigation costs reasonably incurred. *See* 18 Pa. Cons. Stat. Ann. § 5701 *et seq.*,

38.    Assuming just a few thousand web visitors over the past five years, the minimum liquidated damages award of $1,000 per violation alone would meet the $5

million threshold.  The maximum possibility of liquidated damages computed at $100 per day far exceeds that threshold. Plaintiffs allege that Heritage Valley's allegedly violative conduct began in "approximately 2018." Compl. ¶ 1. It would only require 29 people to have visited the website on or before January 1, 2019, to exceed the $5 million threshold (calculated as 1,756 days x $100 x 29 = $5,092,400). That does not include the punitive damages or attorney's fees, which are properly considered for CAFA purposes and add significant cost. *See Frederico v. Home Depot,* 507 F.3d 188, 197-99  (3d Cir. 2007) (noting that punitive damages are included in the amount in controversy and that "Plaintiff also seeks attorneys' fees, which can exceed six figures in a class action and are properly aggregated and considered for purposes of determining the amount in controversy under CAFA.").

39.    While statutory damages on their own are sufficient to meet the threshold for removal, Plaintiffs additionally allege that they are entitled to "compensatory, punitive, and/or nominal damages in an amount to be proven at trial," for each of the invasion of privacy, breach of fiduciary duty, and breach of confidence putative class claims. *Id.* ¶¶ 141, 151, 167. Accordingly, Heritage Valley meets all requirements for removal under CAFA, and the Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d).

## II. Removal Is Proper Pursuant to the Federal Officer Removal Statute, 28 U.S.C. § 1442(a)(1).

40.    Because the conduct challenged by Plaintiffs was undertaken pursuant to the federal government's extensive efforts to build a nationwide health information technology infrastructure over the past two decades, this case is also removable under the Federal Officer Removal statute.  28 U.S.C. § 1442.

41.    At least two other courts have held that removal is proper under nearly identical circumstances. *See Doe I v. UPMC*, No. 20-cv-359, 2020 WL 4381675, at *6 (W.D. Pa. July 31, 2020); *Doe v. ProMedica Health Sys., Inc.*, No. 20-cv-1581, 2020 WL 7705627, at *2–3 (N.D. Ohio Oct. 30, 2020).

42.    The Federal Officer Removal statute permits removal where the defendant is "the United States or any agency thereof or any officer (or any person acting under that officer) of the United States or of any agency therefore, in an office or individual capacity, for or relating to any act under color of such office."  28 U.S.C. § 1442(a)(1).

43.    The federal officer removal statute is to be broadly construed to allow defendants to remove whenever they are acting under color of federal office.  *Arizona v. Manypenny*, 451 U.S. 232, 242 (1981); *Colorado v. Symes*, 286 U.S. 510, 517 (1932); *Sun Buick, Inc. v. Saab Cars USA, Inc.*, 26 F.3d 1259, 1262 (3d Cir. 1994)); *see also Willingham v. Morgan*, 395 U.S. 402, 406 (1969) (noting that the scope of the federal officer removal statute "is not narrow or limited").

44.    To remove a case under the statute, a defendant must show that (1) it is a "person" within the meaning of the statute; (2) it is "acting under a federal officer's authority;" (3) the claims are "for or relating to" conduct taken under color of that authority; and (4) the defendant can assert a "colorable federal defense." *Papp v. Fore-Kast Sales Co.*, 842 F.3d 805, 812 (3d Cir. 2016); *see also Moore v. Elec. Boat Corp.*, 25 F.4th 30, 34 (1st Cir. 2022); *O'Connell v. Foster Wheeler Energy Corp.*, 544 F. Supp. 2d 51, 53 (D. Mass. 2008) (proper removal under federal officer removal statute).[3]

---

[3] When Congress amended § 1442(a)(1) in 2011 to reach removal based on a claim "for or relating to any act under color of [federal] office," *see* Removal Clarification Act of 2011, Pub. L. No. 112-51, 125 Stat. 545, the "addition of the words 'or relating to' in the 2011 revision of the statute . . . was intended to 'broaden the universe of acts that enable Federal

45.     Plaintiffs' claims relate to conduct undertaken by Heritage Valley in furtherance of the federal government's Meaningful Use Program.

46.     Since at least 2004, the federal government – through executive order, legislation, and regulatory action – has directed and overseen a public-private initiative to develop a nationwide infrastructure for health information technology.

47.     The federal government has incentivized and directed providers that participate in the Medicare and Medicaid program (like Heritage Valley) to offer patients online access to their records, and to optimize patient engagement with their medical information.

48.     The federal government has also modeled the behavior it wants to see by creating a portal for Medicare beneficiaries and working with the same third-party services with the same or similar "source code" at issue in this case.

49.     Heritage Valley has dutifully assisted and followed the federal government's direction in this effort, including through the actions challenged by Plaintiffs here. In so doing, it has acted within the penumbra of federal action and office. Given this, and the Supreme Court's directive that the statute must be broadly construed, the requirements of the Federal Officer Removal statute are satisfied.

**A. The ONC Creates Nationwide Health Information Technology in Conjunction with Private Sector Through the Meaningful Use Program.**

50.     In 2004, President Bush issued an Executive Order that established a National Health Information Technology Coordinator (ONC). *See* Exec. Order 13335

---

officers to remove [suits] to Federal court." *Papp*, 842 F.3d at 813. Accordingly, the Third Circuit and other federal circuits, "have consistently given this requirement a broad reading and held that no causal link [between the official act and the plaintiff's alleged injury] is required." *Moore*, 25 F.4th at 35.

(Apr. 27, 2004).  The purpose of the Order was to spark a "nationwide implementation of interoperable health information technology in both the public and private health care sectors." *Id.*

51.    In 2009, Congress codified the Office of the National Coordinator in the Health Information Technology for Economic and Clinical Health Act of 2009. 123 Stat. 115, 247 (2009). At that time, Congress allocated billions of dollars to the Center for Medicare and Medicaid Services (CMS) to "invest in the infrastructure necessary to allow for and promote the electronic exchange and use of health information for each individual in the United States consistent with the goals outlined in the strategic plan developed by the [ONC]." *Id.* at 246.

52.    As with President Bush's Executive Order, Congress tasked the National Coordinator with, *inter alia*, "updat[ing] the Federal Health IT Strategic Plan (developed as of June 3, 2008) to include specific objectives, milestones, and metrics with respect to": "(i) [t]he electronic exchange and use of health information and the enterprise integration of such information" and "(vii) [s]trategies to enhance the use of health information technology in improving the quality of health care." 42 U.S.C. § 300jj-11(c)(3)(A) (Strategic plan).

53.    Consistent with its mandate, the ONC has published guidance for private providers to follow, including in five-year plans.

54.    In the 2015–2020 plan, it dictated that "federal agencies" were to "collaborate with . . . private stakeholders to . . . build a culture of electronic health information access and use."[4]

---

[4] ONC, Federal Health Information Technology Strategic Plan 2015-2020, available at https://www.healthit.gov/sites/default/files/9-5-federalhealthitstratplanfinal_0.pdf.

55.     In the 2020–2025 plan, it noted that this has already happened, stating that "[f]ederal, state, and local governments, along with the private sector, have worked together to help digitize health information and healthcare."[5]

56.     One critical aspect of this strategy is CMS's "Meaningful Use" program. 42 C.F.R. § 495.2–495.370; *see also* DEPARTMENT OF HEALTH AND HUMAN SERVICES, CENTERS FOR MEDICARE & MEDICAID SERVICES, *Medicare and Medicaid Programs; Electronic Health Record Incentive Program*, 75 Fed. Reg. 44314 (Jul. 28, 2010).

57.     As the name implies, the program aims to increase patient's "meaningful use" and engagement with electronic health records. In introducing the final regulations, the agencies stated that "[c]ertified EHR technology used in a meaningful way is one piece of a broader HIT infrastructure needed to reform the health care system and improve health care quality, efficiency, and patient safety." *Id.* at 44321.

58.     Under this program, providers must meet certain criteria to receive full Medicare reimbursement.

59.     As part of the program, the federal government directed providers to create interoperable patient "portals" that allow users to communicate directly with their providers and immediately access (or transfer) their medical records. *See* 42 C.F.R. § 495.20(f)(12)(i)(B) ("Beginning in 2014, provide patients the ability ***to view online***, download, and transmit information about a hospital admission." (emphasis added)); *see also* REBECCA MITCHELL COELIUS, *Get the Facts Regarding View, Download and Transmit 2014 requirements*, HealthITbuzz, The Latest on Health IT from the ONC,

---

[5] ONC, Federal Health Information Technology Strategic Plan 2020-2025 available at https://www.healthit.gov/sites/default/files/page/202010/Federal%20Health%20IT%20Strategic%20Plan_2020_2025.pdf.

at 1 (Jan. 31, 2014) ("All providers and hospitals attesting to Meaningful Use in 2014 will need to implement the [view, download, and transmit] VDT capabilities for their patients. Those in Stage 1 will attest for **access**, those in Stage 2 will attest for **use**. The term 'online access' used in the VDT measure definitions refers to all three capabilities – view, download and transmit.").

60.    The ONC has specified "how a patient portal helps achieve meaningful use requirements," as well as how a provider can "actively promote and facilitate portal use" and how providers can optimize such portals – explaining that they "must be engaging and user-friendly."[6]

61.    The ONC has also issued a "Patient Engagement Playbook," which was described as "a tool for clinicians, health care practice staff, hospital administrators, and others who want to leverage health IT – particularly electronic health records (EHR) patient portals – to engage patients in their health and care." THE OFFICE OF THE NAT'L COORDINATOR FOR HEALTH INFORMATION TECHNOLOGY, *Patient Engagement Playbook* (last updated Apr. 17, 2019).

62.    Regulations require health care providers to attest to the National Coordinator and to CMS on their progress with respect to this criterion in particular. *See* 45 C.F.R. § 170.315(e)(1)(i) (requiring reporting on "Patient engagement" for "[v]iew, download, and transmit to 3d party"; "EHR technology must provide patients (and their authorized representatives) with an online means to view, download, and transmit to a 3rd party the data specified below," including "[t]he Common [Meaningful Use] Data Set").

---

[6] ONC, *How to Optimize Patient Portals for Patient Engagement and Meet Meaningful Use Requirements*  (2013), available at
https://www.healthit.gov/sites/default/files/nlc_how_to_optimizepatientportals_for_
patientengagement.pdf.

63.     Regulations also provide for incentive payments for providers who reached certain levels of engagement with electronic health record use through the patient portal. *See* 42 U.S.C. § 1395w-4(o) (incentives for adoption and meaningful use of certified HER technology); *see also* C. Stephen Redhead, *The Health Information Technology for Economic & Clinical Health (HITECH) Act*, at 2 Cong. Res. Serv. (Apr. 27, 2009) (discussing various financial incentives).

64.     In addition to this guidance, CMS has created its own portal, offering a model for private providers to follow.

65.     To optimize individual engagement with the portal, CMS relies on third-party marketers, like Google and Facebook.

66.     By working with over two dozen third-party servicers, CMS is able to provide users with the information most relevant to them.[7]

**B.  Heritage Valley Is A "Person" Under 28 U.S.C. § 1442(a)(1).**

67.     Removal under the statute is permitted by "any person acting under [a federal] officer." 42 U.S.C. § 1442(a)(1).

68.     Consistent with the Supreme Court's command that the statute be construed broadly, organizations, corporate defendants, and government entities have routinely been deemed "persons" who can remove actions under the statute. *See, e.g.*, *Papp*, 842 F.3d at 812 ("[W]e look to § 1 of Title I of the United States Code, which defines 'person' to 'include corporations, companies, associations, firms, partnerships, societies,

---

[7] *See generally* Medicare.gov Privacy Policy, available at https://www.medicaid.gov/privacy-policy/index.html (explaining that website users' "activity on third-party websites that Medicare.gov links to (like Facebook or Twitter) is governed by the security and privacy policies of those websites," and that any information users "provide to register on Facebook is voluntarily contributed and isn't maintained by" CMS).

and joint stock companies, as well as individuals.' Under this definition, Boeing, a corporation, is in legal fact a person."); *Moore v. Elec. Boat Corp.*, 25 F.4th 30, 32 (1st Cir. 2022) (allowing removal by a corporation).

69.     Because Heritage Valley is a nonprofit corporation, Compl. ¶ 14, it qualifies as a person under the statute.

### C.  Heritage Valley Acted Under a Federal Officer.

70.     An entity is acting under a federal officer whenever it is engaged in "an effort to assist, or to help carry out, the duties or tasks of the federal superior" and is subject to "subjection, guidance, or control." *Watson v. Philip Morris Cos.*, 551 U.S. 142, 151–52 (2007).

71.     To that end, the Federal Officer Removal statute should be "liberally construed" to fulfill its purpose of allowing federal officials and agents who are being prosecuted in state court for acts taken in their federal authority to remove the case to federal court. *Id.* at 147–49.

72.     These requirements are met here because the federal government is incentivizing, regulating, monitoring, and supervising Heritage Valley's actions in the Meaningful Use program to meet the federal government's national priority of interoperable health information technology.

73.     First, Heritage Valley (along with many other entities) is helping the government produce the nationwide, interoperable information technology infrastructure for health information.

74.     The federal government itself has repeatedly acknowledged the private sector's essential role in this project, most recently stating that the federal government and private sector "have worked together to help digitize health information and

healthcare." *See* 2020-2025 Strategic Plan.

75.    Second, in the absence of Heritage Valley's actions (and the work of comparable medical providers throughout the country), the federal government would be left alone to complete its mission – and would likely do exactly that, as underscored by its efforts to digitize information and increase patient engagement with Medicare beneficiaries.

76.    Third, the government has specified how to best enhance patient engagement, including through patient portals.

77.    It has clarified how to generally design the portals and has told entities how best to market their online resources.

78.    Furthermore, because the Meaningful Use program's incentives are available only to entities participating in the Medicare and Medicaid programs, CMS substantially incentivizes Heritage Valley and comparable organizations not only to maintain public websites and/or patient portals, but also to achieve meaningful use of them.

79.    And, through its own engagement with third-party services, it has modeled the behavior that private entities are to follow.

80.    Finally, the government has created an office dedicated to this endeavor, closely monitored the work of private entities (like Heritage Valley), and supervised the general development of this information technology infrastructure.

### D. Plaintiffs' Claims Are for or Relate to Acts Under Color of the Federal Office.

81.    Any single claim is independently sufficient to satisfy the "for or relating to" requirement under Section 1442(a)(1). *See, e.g.*, *Moore*, 25 F.4th at 35.

82.     All that is needed is "for there to be a connection or association between the act in question and the federal office." *Papp*, 842 F.3d at 813.

83.     That low bar is clearly met here.

84.     Plaintiffs directly challenge Heritage Valley's website analytics practices, as well as its alleged tracking of online behaviors through source code and cookies and use of marketing companies such as Facebook to promote online patient engagement.

85.     The Meaningful Use program envisions these activities, as evidenced by the federal government's own use of these codes and third parties for its Medicare website.

86.     In like circumstances, courts have held that defendant medical providers were "acting under" a federal officer while performing similar alleged conduct. *See, e.g.*, *UPMC*, 2020 WL 4381675, at *6 (holding that the UPMC's participation in the Meaningful Use Program was sufficient to satisfy the "acting under" requirement necessary for the federal officer removal statute); *Doe v. ProMedica Health Sys., Inc.*, No. 3:20 CV 1581, 2020 WL 7705627, at **2-3 (N.D. Ohio Oct. 30, 2020) ("Because [ProMedica Health System's] participation assisted the federal government in achieving [the creation of a unified system of patient electronic health records], Defendant has satisfied the 'acting under' prong").

87.     In *UPMC*, as in this case, plaintiffs sought redress under state law for UPMC's alleged disclosure of personally identifiable information to third parties for Internet marketing purposes without their knowledge or authorization. *UPMC*, 2020 WL 4381675, at *1. The *UPMC* court focused on both the portal and the public website as being ways of furthering the government's goal of increasing patient engagement with electronic health records. *Id.* at *6 ("UPMC, as a participant in the Meaningful Use Program, receives incentive payments from DHHS for its development and use of the

UPMC website and the MyUPMC portal in accordance with the program's criteria."). The *UPMC* court also emphasized that "it is not necessary that the complained-of conduct be done at the specific behest of the federal superior," and "any dispute about whether the allegedly wrongful conduct was outside the scope the private entity's duties is the very thing that should be left to a federal court to decide." *Id.* at *7. A private entity "need only show that the allegations in the complaint are directed at the private entity's efforts to assist a federal superior." *Id.*

88.     Here, as in *UPMC*, "[t]here is plainly a connection or association between [Heritage Valley's alleged] website management and marketing strategies and the Meaningful Use program, particularly the incentives that are tied to patient participation and usability. Plaintiffs' claims are therefore 'for or relating to' an act under color of federal office." *Id.*

### E. Heritage Valley Raises Colorable Federal Defenses to Plaintiffs' Claims.

89.     The final requirement for removal under 42 U.S.C. § 1442(a)(1) also is a low bar and requires only that the defendant make an assertion that is "defensive" and "based in federal law." *Mesa v. California*, 489 U.S. 121, 129–30 (1989).

90.     A "colorable federal defense" need not be "clearly sustainable," but rather, is sufficient unless it is "immaterial and made solely for the purpose of obtaining jurisdiction" or "wholly insubstantial and frivolous." *Moore*, 25 F.4th at 37; *accord Bahrs v. Hughes Aircraft Co.*, 795 F. Supp. 965, 969 (D. Ariz. 1992) ("The question is not whether a defendant's claimed defense is meritorious, but only whether a colorable claim to such a defense has been made.")

91.     By way of illustration and without limitation, Heritage Valley has at least

two colorable federal defenses to the claims at issue here that satisfy this requirement.

92. First, Plaintiffs specifically refer to federal law to describe Heritage Valley's alleged duties involving PHI and to describe the scope of the PHI that allegedly was shared. *See* Compl. ¶¶ 53-61.

93. Thus, in response to Plaintiffs' repeated claim that "protected health information" was disclosed, Heritage Valley will argue that the information purportedly disclosed is outside of the purview of PHI protected by federal law.

94. In an analogous case against numerous health care providers, the United States District Court for the Northern District of California has held that the information identified by Plaintiffs here is not PHI. *See Smith v. Facebook*, 262 F. Supp. 3d 943, 954–55 (N.D. Cal. 2017). This defense turns on an interpretation of federal law and on its own is sufficient to satisfy this element.

95. Second, to the extent that they ever could allege a viable cause of action under Pennsylvania law, Heritage Valley will argue that federal law preempts Plaintiffs' common law claims for alleged invasions of privacy, breach of fiduciary duty, and breach of duty of confidentiality. *See* Compl. ¶¶ 130-167; *UPMC*, 2020 WL 4381675 at *7.

96. Because each of the requirements of the Federal Officer Removal statute is satisfied, removal to this Court is proper.

## REMOVAL PROCEDURES

97. Heritage Valley files this Notice of Removal within thirty days of receiving the Complaint on October 5, 2023. 28 U.S.C. § 1446(b).

98. Heritage Valley attaches as a copy of all process, pleadings, orders, and other documents" currently on file in the state court, including Plaintiffs' Complaint, attached as **Exhibit A** hereto. *Id.* § 1446(a).

99.     Heritage Valley will promptly give written notice to all adverse parties and the clerk of the Court of Common Pleas of Beaver County. *Id.* § 1446(d).

## CONCLUSION

For the forgoing reasons, Defendant Heritage Valley hereby removes this action, *Robinson v. Heritage Valley Health System, Inc.*, Case No. 11286-2023 (Ct. Comm. Pl. Beaver Cty.), to this Court from the Court of Common Pleas of Beaver County, Pennsylvania, pursuant to 28 U.S.C. §§ 1332(d) and 1442(a)(1).

Dated: October 24, 2023          **BAKER & HOSTETLER LLP**

*/s/ Edward J. McAndrew*
Edward J. McAndrew (Pa. I.D. 77103)
1735 Market Street, Suite 3300
Philadelphia, PA 19103
Tel.: (215) 564-8386
Email: emcandrew@bakerlaw.com

Carrie Dettmer Slye (*Pro hac vice application forthcoming*)
312 Walnut Street, Suite 3200
Cincinnati, Ohio 45202-4074
Tel.: (513) 929-3400
cdettmerslye@bakerlaw.com

*Attorneys for Defendant Heritage Valley Health System, Inc.*